**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TORLI H. KRUA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )     No. 21-cv-11061-AK |
| v. | ) |
| | ) |
| EMMETT G. PRICE III, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

**A. KELLEY, D.J.**

Self-represented plaintiff, the Rev. Torli H. Krua ("Rev. Krua"), brings this employment

discrimination action against the Emmanuel Gospel Center ("EGC") and two associated

individual defendants, the Rev. Dr. Emmett G. Price III ("Dr. Price") and Jeff Bass ("Mr. Bass").

Rev. Krua also names the United States Congress and the United States Department of State in

his complaint.  EGC and the individual defendants have moved to dismiss the complaint for lack

of subject-matter jurisdiction and failure to state a claim upon which relief may be granted.  For

the reasons discussed below, that motion will be **GRANTED**, in part, and **DENIED**, in part**.**

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Unless otherwise noted, the facts are recited as alleged in Rev. Krua's complaint.  [See

Dkt. 1 ("Compl.")].  Rev. Krua is a native of Liberia and a refugee of the civil war in that

country who works as a Baptist pastor and a human rights advocate in Boston.  Rev. Krua, a

Black man, has conducted refugee ministry trainings and workshops for churches throughout the

United States.  For about 20 years, Rev. Krua has known the Rev. Dr. Gregg Detwiler ("Dr.

Detwiler"), the head of intercultural ministries at EGC.  EGC is a Christian organization based in Boston which, among other activities, provides support for immigrants and refugees.

In January 2014, Dr. Detwiler contacted Rev. Krua to express interest in establishing a refugee ministry for the benefit of the churches served by EGC.  Rev. Krua agreed to work with EGC, but only if EGC compensated him for his services.  Dr. Detwiler indicated that EGC would compensate Rev. Krua, promote his work, and help fund his work overseas with diaspora immigrant and refugee Christians.  Dr. Detwiler requested that Rev. Krua send him a business plan and strategy for the proposed refugee ministry.  Dr. Detwiler further informed Rev. Krua that the best way for handling his compensation would be through Missions Door, a missionary agency for which Rev. Krua was already working.  Rev. Krua sent Dr. Detwiler the proposed business plan, and Dr. Detwiler acknowledged receipt of the plan and promise to adopt it and establish the Greater Boston Refugee Ministry ("GBRM").

In March 2014, Dr. Detwiler suggested to Rev. Krua that a white woman should join the GBRM team as co-director to better communicate the ministry's strategy to white evangelical Christians.  Dr. Detwiler suggested that Dr. Carmen Aldinger ("Dr. Aldinger"), a white woman, fill this co-director role.  Rev. Krua and Dr. Aldinger were equally involved in the work of planning, meeting stakeholders, and fundraising for GBRM.  Rev. Krua was told during this time that EGC had no money for GBRM, and GBRM was responsible for raising money to pay its expenses, including Rev. Krua's salary.

In May 2015, Dr. Aldinger resigned from GBRM, and Dr. Detwiler again expressed a preference to hire a white woman to fill the vacant co-director role.  Sarah Blumenshine ("Ms. Blumenshine"), a white woman, was hired as co-director.  Dr. Detwiler informed Rev. Krua and Ms. Blumenshine that, as a result of GBRM's fundraising, there was enough money to pay each

of them for ten hours per week.  EGC set a lower pay rate for Rev. Krua than for Ms. Blumenshine, despite him having more expertise and training.  Rev. Krua alleges that this disparity in pay rate was based on his race, gender, and national origin.

In November 2018, Rev. Krua filed a complaint with the management of EGC, alleging discrimination.  An assistant executive director of EGC, "Liza," was appointed to investigate Rev. Krua's complaint.  Liza's investigation determined that Rev. Krua had not been paid for two years, and had been given a lower pay rate than the white women who served as his co-directors.  Liza recommended that equal pay rates and full-time pay be instituted for co-directors in January 2019.  She proposed a system-wide redress involving EGC churches and partner organizations to address issues with pay discrimination and back pay.  However, in June 2019, Liza informed Rev. Krua that EGC would not be able to offer him full-time pay at an equal rate to his white female co-director.

In May 2020, Rev. Krua filed a complaint with the EGC board of directors.  The Board conducted an investigation, found that EGC had underpaid Rev. Krua for 30 months, and offered him a settlement.  Rev. Krua declined two offers of settlement and requested mediation.  Rev. Krua then filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"), which denied his claim as time-barred.

Rev. Krua filed this lawsuit in July 2021, bringing claims under Title VII, the Equal Pay Act of 1963, the Age Discrimination in Employment Act ("ADEA"), and the Civil Rights Act of 1991 against five defendants, including EGC, Dr. Price, Mr. Bass, the United States Congress, and the United States Department of State.  After Rev. Krua failed to effectuate service upon any of these defendants within six months, the Court conditionally dismissed his complaint.  [Dkt. 12].  Rev. Krua then obtained waivers of service from EGC, Dr. Price, and Mr. Bass, and moved

that the Court withdraw its conditional order of dismissal. [Dkts. 14–16, 18]. The Court granted

that motion and vacated its order of dismissal. [Dkt. 19]. EGC, Dr. Price, and Mr. Bass then

timely filed the instant joint motion to dismiss. [Dkt. 24].

## II.    DISCUSSION

Defendants have moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6), alleging that the Court lacks subject-matter jurisdiction to hear Rev. Krua's claims, or

in the alternative, that Rev. Krua has failed to state a claim upon which relief may be granted.

As always, the Court begins with the question of jurisdiction.

### A.    Subject Matter-Jurisdiction

#### 1.    Legal Standard

Federal courts are of limited jurisdiction, and on a motion to dismiss pursuant to Rule

12(b)(1), the Court must ensure it has the constitutional and statutory authority to adjudicate.

See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). "The existence of

subject-matter jurisdiction 'is never presumed,'" Fafel v. Dipaola, 399 F.3d 403, 410 (1st Cir.

2005) (quoting Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998)), and federal courts "have

a duty to ensure that they are not called upon to adjudicate cases which in fact fall outside the

jurisdiction conferred by Congress," Esquilín–Mendoza v. Don King Prods., Inc., 638 F.3d 1, 3

(1st Cir. 2011). The party asserting federal jurisdiction is responsible for establishing that such

jurisdiction exists, see Kokkonen, 511 U.S. at 377; Spielman v. Genzyme Corp., 251 F.3d 1, 4

(1st Cir. 2001), and the Court "must resolve questions pertaining to its subject-matter jurisdiction

before it may address the merits of a case," Donahue v. City of Boston, 304 F.3d 110, 117 (1st

Cir. 2002) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101–02 (1998)).

## 2.    Timeliness of Charge

Two of the statutes Rev. Krua invokes in his complaint—Title VII and the ADEA—specifically limit the jurisdiction of federal district courts to cases in which the plaintiff exhausted his or her administrative remedies by timely filing a charge of discrimination with a state or federal agency.  42 U.S.C. § 2000e-5; 29 U.S.C. § 626(d)(1).  The federal agency with jurisdiction over such charges is the Equal Employment Opportunity Commission ("EEOC"), and a plaintiff must file his or her EEOC charge within 180 days of the alleged violation. Alternatively, a Massachusetts plaintiff may instead choose to file a charge with the Massachusetts Commission Against Discrimination ("MCAD"), which has concurrent jurisdiction over violations of federal antidiscrimination statutes.  If a plaintiff chooses to file a charge with MCAD instead of the EEOC, he or she must do so within 300 days of the alleged violation.  42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(B).

A Title VII or ADEA plaintiff who, like Rev. Krua, is not a federal employee, must exhaust administrative remedies by complying with the procedural requirements of the charge process before filing suit in district court.  See Jorge v. Rumsfeld, 404 F.3d 556, 564 (1st Cir. 2005) (applying exhaustion requirement to all Title VII plaintiffs, and all ADEA plaintiffs except federal employees).  "Exhaustion has two key components: the timely filing of a charge … and the receipt of a right-to-sue letter from the agency."  Id.

Here, Rev. Krua has failed to adequately plead that he timely filed a charge before either the EEOC or MCAD.  Rev. Krua simultaneously filed a charge with the EEOC and MCAD on October 28, 2020.  [Decl. of Bradford Smith ("Smith Decl."), Dkt. 26, at 4].  This charge denotes a "violation date" of December 24, 2019, which corresponds to the date Rev. Krua alleges he first learned of the discrepancy in pay between himself and his white female colleagues.  [Id. at

4–5].  Rev. Krua does not, in either his charge or complaint, allege any plausible violation of Title VII or the ADEA that occurred after December 24, 2019: conversely, he alleges in both documents that his employment relationship with EGC ended on October 15, 2019, indicating that no further violations could have occurred after Rev. Krua allegedly first learned of EGC's discriminatory practices on December 24, 2019.  [Id.].  Accordingly, Rev. Krua was required to initiate proceedings before the MCAD within 300 days of December 24, 2019.  This 300-day window expired on October 19, 2020, nine days prior to Rev. Krua's filing of his charge on October 28, 2020.

### 3.   Equitable Tolling

Where a plaintiff fails to timely file a charge, ordinarily this Court would be without jurisdiction to consider his complaint.  However, the doctrine of equitable tolling permits the Court to exercise jurisdiction where it concludes that, upon review of the unique circumstances of the case, the plaintiff was not at fault for his or her oversight of the charge deadline. Generally, courts consider five factors in determining whether to apply the doctrine of equitable tolling in an employment discrimination case: "(1) lack of actual notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the filing requirement."  Mercado v. Ritz-Carlton San Juan Hotel, Spa, & Casino, 410 F.3d 41, 48 (1st Cir. 2005) (internal citations omitted).  Because the statutory time limits in discrimination cases "are important," district courts "should employ equitable tolling sparingly." Id. at 46 (quoting Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999)).

The Mercado court directed district courts to begin their analysis by considering the first two enumerated factors, whether the plaintiff had either actual or constructive knowledge of the

6

filing requirement.  Id. at 48.  "[A]ctual knowledge occurs when an employee becomes generally aware that he possesses a legal right to be free from the type of discrimination he has alleged," and does not require "specific awareness of the 300–day statutory filing period."  Id. Constructive knowledge is presumed "if the employer had complied with its statutory obligation to post the EEOC notices in conspicuous locations, and it also is presumed when an employee has retained an attorney-in both instances, regardless of whether the plaintiff in fact is aware of his rights."  Id. at 48–49.

Here, the record suggests that Rev. Krua "became generally aware" of, and thus had actual knowledge of, the alleged equal pay violations on December 24, 2019, 309 days before he filed his charge.  Rev. Krua alleges that he filed an internal complaint against EGC in November 2018 on the suspicion that the church was discriminating against him.  [Compl. ¶ 26.]  EGC appointed an assistant executive director named Liza to investigate Rev. Krua's allegations.  [Id.] On December 24, 2019, Liza reported her findings to Rev. Krua.  [Id.].  Rev. Krua understood from these findings that he "was not paid for two years" and that "EGC gave [him] a lower pay rate than [his] white female colleagues who served as co-directors."  [Id.]  Through these allegations, Rev. Krua has established that he had actual knowledge of his claim no later than December 24, 2019: the fact that EGC undertook the investigation in response to Rev. Krua's own complaint strongly suggests that, even if Rev. Krua had not been fully aware of the statutory scheme protecting employees from pay discrimination, he had a general awareness that he possessed "a legal right to be free" from this type of discrimination.  Mercado, 410 F.3d at 48.

Turning to the third element, the record suggests that Rev. Krua exercised diligence in pursuing his rights upon learning of the pay disparity.  Rev. Krua first worked with Liza, the employee that EGC assigned to review his internal pay discrimination complaint.  [Compl. ¶ 26].

Liza "discovered, documented, and presented" findings that Rev. Krua had been paid less than his white, female colleagues. [Id.] Rev. Krua alleges that, in January 2019, Liza recommended equal pay rates for all co-directors and directors, [id. ¶ 27], and proposed a "system wide redress" for back pay involving all EGC churches and partners, [id. ¶ 28]. Rev. Krua alleges he worked with Liza "on finding a solution" and that, subjectively, it seemed to him as if "a solution and breakthrough was imminent." [Id.] In May 2020, Rev. Krua filed a further complaint with the EGC board of directors, which, he alleges, "promised to resolve the problem." [Id. ¶ 30]. The board found that EGC underpaid Rev. Krua for 30 months and twice offered him a settlement. [Id. ¶¶ 31–32]. Rev. Krua declined each of these settlement offers and requested mediation before filing his charge. [Id. ¶¶ 32–33].

Accepting Rev. Krua's allegations as true, as is required on a motion to dismiss, the Court concludes that he acted with diligence in the months following December 24, 2019, the date on which he became aware of his rights. Rev. Krua first pursued a collaborative approach to resolving his claims for back pay by working with Liza, the EGC employee assigned to investigate his claims. Subsequently, Rev. Krua filed an additional complaint with EGC's board, which promised to resolve the problem and tendered two offers of settlement. Rev. Krua was reasonable in relying on the board's promise to resolve the matter outside of the administrative and judicial processes, and his delay in filing a charge as he waited for EGC to tender an offer of settlement did not constitute a lapse in diligence.

The fourth and fifth factors, prejudice to the defendant and the plaintiff's reasonableness in ignoring the filing requirement, likewise favor Rev. Krua. Here, Defendants would not be prejudiced by the Court's exercise of its equitable tolling factor, as Rev. Krua had put them on notice of his equal-pay claims well in advance of statutory deadline. EGC had actual knowledge

of Rev. Krua's claims on at least three occasions prior to the deadline: first, when Rev. Krua filed his initial internal complaint; second, when the EGC employee presented her findings that EGC had discriminated against Rev. Krua; and third, when Rev. Krua filed his renewed complaint with the board of directors.  Defendants' abilities to adequately defend against Rev. Krua's claims were thus in no way implicated by his delay in filing his charge.  Likewise, as a self-represented litigant, Rev. Krua's ignorance of the filing requirement is more excusable than it would have been had he been represented by counsel at the time he filed his charge.  Although all parties, whether represented by counsel or not, are responsible for being aware of and complying with statutory deadlines, the Court is inclined to make more liberal use of its equitable powers where a plaintiff is self-represented and where, as here, he missed the deadline by fewer than 10 days.

In sum, the question is close.  Equitable tolling must be applied sparingly, and the Court by no means suggests that any plaintiff may toll the statutory deadline to file an administrative charge simply by working to resolve a pay discrimination matter through his employer's internal processes.  This case, however, presents unique circumstances such that the interests of justice demand that the Court equitably toll the charge deadline.  Rev. Krua worked diligently for years to resolve his equal-pay claims directly with EGC, and has alleged that, on at least two occasions, employees of EGC admitted wrongdoing and represented that the organization would work to make Rev. Krua whole.  Although Rev. Krua was perhaps naïve in presuming that he could resolve his claims without agency or court proceedings, the Court will not punish a self-represented party for working in good faith, and on the Defendants' representations of good faith, to resolve a matter amicably before resorting to litigation.  The legal concept at the root of

equitable tolling is *equity*, and the Court would not do equity to these parties by dismissing the action on the basis of Rev. Krua's nine-day lapse in filing his charge.

### B.      TITLE VII AND ADEA CLAIMS

Turning to Defendants' arguments on the merits, the Court finds that Rev. Krua has alleged sufficient facts to proceed on his Title VII and ADEA claims.  Defendants do not dispute that Rev. Krua's complaint states a *prima facie* case of employment discrimination based on his age, race, national origin, and gender; to wit, Rev. Krua alleges that he is a Black, Liberian-American male over the age of 40 who, on the basis of these immutable characteristics, was paid less than similarly situated colleagues.  Rather, Defendants allege that Rev. Krua is barred from relief because he was not employed by EGC, or, in the alternative, because he was employed as a minister.

#### 1.      Employment Relationship

To state a claim under Title VII or the ADEA, a plaintiff must have an employment relationship with the defendant.  See Lopez v. Massachusetts, 588 F.3d 69, 72 (1st Cir. 2009); Jones v. Montachusett Reg. Trans. Auth., 594 F. Supp. 3d 237, 243–44 (D. Mass. 2022).  The First Circuit defines the terms "employer" and "employee" with "reference to … common law agency principles."  Lopez, 588 F.3d at 83.  The common-law element of "control by the putative employer over the putative employee"—and specifically, control over the "manner and means" by which the employee performs the job—is the "principal guidepost" that determines the existence of a relationship.  DeLia v. Verizon Comms., Inc., 656 F.3d 1, 4, 5 (1st Cir. 2011) (citing Lopez, 588 F.3d at 84–85).  A plaintiff's subjective belief that a defendant was his or her employer is, alone, "insufficient to create a triable issue of material fact."  Id. at 4.  The First

Circuit has further urged district courts to consider the non-exclusive factors set forth by the

EEOC in its Compliance manual:

> the employer has the right to control when, where, and how the worker performs
> the job; the work does not require a high level of skill or expertise; the work is
> performed on the employer's premises; there is a continuing relationship between
> the worker and the employer; the employer has the right to assign additional
> projects to the worker; the employer sets the hours of work and the duration of the
> job; the worker is paid by the hour, week, or month rather than the agreed cost of
> performing a particular job; the worker does not hire and pay assistants; the work
> performed by the worker is part of the regular business of the employer; the
> employer is in business; the worker is not engaged in his/her own distinct
> occupation or business; the employer provides the worker with benefits such as
> insurance, leave, or workers' compensation; the worker is considered an employee
> of the employer for tax purposes; the employer can discharge the worker; and the
> worker and the employer believe that they are creating an employer-employee
> relationship. The guidelines emphasize that these criteria should be viewed in light
> of the totality of the circumstances based on the parties' relationship.

Lopez, 588 F.3d at 84–85 (quoting 2 EEOC, EEOC Compliance Manual, § 2–III, at 5716–17

(2008)).

Defendants argue that Rev. Krua was employed at all relevant times by non-party

Missions Door, and never by EGC or the individual defendants.  In support of their position, they

attach an affidavit from Mr. Bass and associated exhibits, which suggest an understanding

between the parties that Missions Door was Rev. Krua's principal employer.  Rev. Krua rebuts

these exhibits with exhibits of his own, which suggest that the parties may have understood EGC

to have been Rev. Krua's part-time employer.  However, on a motion to dismiss, the Court does

not weigh the evidence before it: its task is merely to determine whether Rev. Krua has plausibly

stated a claim upon which relief can be accorded.  In his complaint, Rev. Krua alleges that EGC

hired him to establish a refugee ministry program in exchange for compensation, [Compl. ¶ 9];

that he performed work for EGC, including planning, meeting stakeholders, fundraising,

speaking, and training volunteers [id. ¶¶ 13, 15]; and that when he raised an employment-related

grievance, EGC appointed a staffer from its personnel department to investigate the matter and deliver a report to him, [id. ¶¶ 26–30].  These allegations as stated within the four corners of Rev. Krua's complaint, if taken as true, are sufficient to give rise to an inference that EGC exercised sufficient control over Rev. Krua's work to establish an employment relationship.

### 2.   Ministerial Exception

Likewise, Rev. Krua has alleged facts sufficient, at this stage, to support an inference that his employment relationship with EGC was secular rather than ministerial.  The ministerial exception, a constitutional doctrine embedded within the First Amendment, exempts religious organizations from liability under most employment discrimination laws as they would apply to ministerial employees.  See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, 565 U.S. 171, 190 (2012).  The Supreme Court has declined to set a "rigid formula" for determining when the exception applies, id., but has "identified four relevant circumstances" of employment, none of which are "essential" to conclude that an employee is a minister, Our Lady of Guadalupe Sch. v. Morrissey-Berru, 140 S.Ct. 2049, 2062 (2020).  Those circumstances include: (1) whether the employee carried a ministerial title; (2) whether the employee's position "reflected a significant degree of religious training followed by a formal process of commissioning"; (3) whether the employee "held [himself] out as a minister of the Church by accepting the formal call to religious service"; and (4) whether the employee's "job duties reflected a role in conveying the Church's message and carrying out its mission."  See id. (quoting Hosanna-Tabor, 565 U.S. at 190–92).  "What matters, at bottom, is what an employee does."  Id. at 2064.

There is no dispute that Rev. Krua is a minister of the Christian faith, and has been employed as such at various times throughout his career.  [See, e.g., Compl. ¶¶ 2, 10].  However, the Court cannot conclude from the pleadings that Rev. Krua's relationship with EGC was

necessarily ministerial.  Rev. Krua alleges that EGC retained him to start a "refugee ministry," [id. ¶¶ 9–10], although the pleadings do not suggest that his role in this "ministry" involved preaching or otherwise promoting EGC's Christian doctrine.  Rather, Rev. Krua alleges that his work involved meeting stakeholders, [id. ¶ 13], fundraising, [id. ¶¶ 13–14], and training volunteers to serve refugee communities, [id. ¶ 15], all of which may be either ministerial or secular in nature.  Further fact development may well establish that EGC employed Rev. Krua as a minister, but on this scant record, the Court cannot jump to that conclusion.

### C.  Remaining Claims

Rev. Krua brings three additional claims, each of which the Court will dismiss.  First, Rev. Krua asks the Court to compel Congress to enact a law concerning racism, slavery, reparations, and Liberia.  [Compl. at p. 14].  Courts are without jurisdiction to compel Congress to enact laws; the Constitution vests the legislative power exclusively within Congress itself.  U.S. Const. art. I, § 1.  Likewise, Rev. Krua asks the Court to compel the State Department to declassify certain documents and refund filing fees to Liberians.  The Court cannot grant relief on this claim, as Rev. Krua has identified no legal authority by which the Court could issue such an order.  Further, any claim against the State Department must be dismissed for improper service, as Rev. Krua did not serve a copy of his complaint upon the department in accordance with the requirements of Federal Rule of Civil Procedure 4(i)(2).

Third, the Court will dismiss Rev. Krua's claim against EGC brought under the Equal Pay Act ("EPA").  An EPA claim requires a plaintiff to show "that the employer paid different wages to specific employees of different sexes for jobs performed under similar working conditions and requiring equal skill, effort and responsibility."  Ingram v. Brink's, Inc., 414 F.3d 222, 232 (1st Cir. 2005).  The EPA impose a two-year statute of limitations that may be extended

to three years for a "willful violation."  29 U.S.C. § 255(a).  Rev. Krua's complaint references only one woman who was employed by EGC within two, or even three, years of the date he filed this action—Stephanie Blumenshine, who was hired as a co-director of GBRM in 2015.  [Compl. ¶ 18].  Rev. Krua alleges that Ms. Blumenshine was hired on the basis of her gender and race, and was paid more than Rev. Krua.  [Id. ¶ 20].  However, the complaint is silent as to Ms. Blumenshine's duties.  Accordingly, there is no basis from which a finder of fact could infer that Rev. Krua and Ms. Blumenshine performed substantially equal work, an essential element of an EPA claim.[1]

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss will be **GRANTED** as to the Equal Pay Act claim and **DENIED** as to the Title VII and Age Discrimination in Employment Act claims.  The Court further **DISMISSES** all claims against the United States Congress and United States Department of State.

**SO ORDERED.**

Dated: January 18, 2023                                    /s/ Angel Kelley

Hon. Angel Kelley
United States District Judge

---

[1] Defendants' opposition and Mr. Bass's affidavit present evidence that Ms. Blumenshine's responsibilities at EGC were different from Rev. Krua's, and that EGC paid Rev. Krua more than Ms. Blumenshine per hour during the period within the statute of limitations.  Rev. Krua does not rebut this evidence in his opposition.